IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL CHARLTON, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>MADRIGAL PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No. ______________<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Michael Charlton, M.D., by and through his attorneys, Kulwin, Masciopinto & Kulwin, LLP, complains against Defendant Madrigal Pharmaceuticals, Inc., as follows.

## NATURE OF THE ACTION

1. Madrigal Pharmaceuticals, Inc. (Madrigal) recruited one of the most accomplished hepatologists in the world to lead its clinical development, and then it destroyed his career for doing the job it hired him to do.

2. Dr. Michael Charlton (Dr. Charlton) left a professorship and the directorship of a major university transplant institute to become Madrigal's Senior Vice President, Head of Clinical Development.

3. His mandate was to safeguard the safety, scientific integrity, and accuracy of the clinical trials and disclosures supporting Madrigal's flagship drug. He did exactly that. Madrigal punished him for it.

4. The stakes were unusually high. Madrigal is a single-product company. Its only approved drug, Rezdiffra, is the source of essentially all of its revenue. Madrigal's entire corporate strategy, and the valuation it has sold to the market, depends on transitioning Rezdiffra from accelerated approval, the conditional, expedited clearance the FDA grants on early evidence, to full approval.

5. Full approval by FDA requires confirming that early promise for safety and efficacy translates to improvement in FDA-recognized clinical outcomes in large clinical trials and confirmation of safety in an expanding number of patients to whom the drug is prescribed.

6. The adverse safety findings and unreproducible efficacy data Dr. Charlton reported cut directly against that narrative. They were material to Madrigal's shareholders, to the FDA, payors (including the Federal Government) and to the physicians prescribing the drug. These concerns, raised by Dr. Charlton over one year ago, are confirmed by a new, independent analysis of the FDA's adverse event reporting system.

7. That was the context in which Dr. Charlton raised his concerns, and that is the context in which Madrigal silenced him.

8. Over the course of roughly eight months, Dr. Charlton repeatedly reported to Madrigal's most senior executives, including directly to Chief Executive Officer Bill Sibold, and Chief Medical Officer David Soergel, that Madrigal was suppressing adverse liver-injury data, presenting efficacy results that could not be reconciled with their own source data, and allowing an unblinded Board member,

former Chief Medical Officer and major shareholder to control the adjudication of clinical outcomes.

9. Madrigal's answer came from its Chief Executive Officer, who, in the presence of Madrigal's Chief Investor Relations Officer and Chief Financial Officer, told Dr. Charlton to *"stop looking."*

10. When Dr. Charlton did not stop looking, Madrigal stripped him of his title, his leadership role, his direct reports, his chairmanship of the institutional committee that reviewed clinical-trial protocols, and every substantive duty he had been hired to perform.

11. Madrigal announced his replacement, a colleague with no experience in MASH or any other liver disease, while Dr. Charlton was out on medical leave. It then positioned him to stand before an international scientific audience and personally endorse the very efficacy data he had reported internally as unverifiable and potentially fraudulent.

12. Faced with a hollowed-out role, a hostile workplace and the prospect of lending his name and his life's reputation to a dangerous suspected fraud, Dr. Charlton was forced to resign.

13. This action arises under the whistleblower-protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A.

14. Dr. Charlton seeks reinstatement or front pay, back pay, compensatory damages for reputational and emotional harm, and all other relief available to a whistleblower who told the truth and lost his career for it.

## THE PARTIES

15. Dr. Charlton is a physician and hepatologist, a doctor who specializes in diagnosing and treating diseases of the liver.

16. At all times relevant to this Complaint, Dr. Charlton was domiciled in and a citizen of the State of Illinois, residing in Chicago, Illinois.

17. Dr. Charlton was an employee of Madrigal within the meaning of 18 U.S.C. § 1514A from October 1, 2024 until his constructive discharge on January 5, 2026.

18. Madrigal is a corporation incorporated under the laws of the State of Delaware with its principal place of business in West Conshohocken, Pennsylvania.

19. Madrigal is a biopharmaceutical company focused on developing and commercializing therapeutics for metabolic dysfunction-associated steatohepatitis ("MASH"), a serious liver disease in which excess fat in the liver drives inflammation and progressive scarring that can advance to liver failure and liver cancer.

20. Madrigal's common stock is registered under Section 12 of the Securities Exchange Act of 1934 and trades publicly on the NASDAQ Global Market. Madrigal is therefore a covered employer within the meaning of 18 U.S.C. § 1514A(a).

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over Count I under 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the Sarbanes-Oxley Act, 18 U.S.C. § 1514A.

22. Dr. Charlton has exhausted the administrative prerequisites to suit under the Sarbanes-Oxley Act.

23. On December 12, 2025, Dr. Charlton filed a timely complaint of retaliation with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), Chicago Region Whistleblower Protection Programs, within 180 days of the violations alleged herein, as required by 18 U.S.C. § 1514A(b)(2)(D) and 29 C.F.R. § 1980.103(d).

24. The administrative complaint was assigned OSHA Case No. 301068233 and was investigated by Regional Supervisory Investigator Shawn Harrigan. The administrative complaint and this action arise from the same operative facts.

25. Dr. Charlton's administrative complaint encompassed the constructive discharge alleged herein. The retaliatory duty-stripping, functional demotion, and coerced-endorsement conduct that culminated in Dr. Charlton's constructive discharge on January 5, 2026 were the same course of retaliation that formed the basis of his December 12, 2025 administrative complaint.

26. On February 25, 2026, Dr. Charlton served a supplemental memorandum on OSHA formally addressing his January 5, 2026 constructive discharge and its relationship to the adverse actions already before the agency.

27. OSHA thereafter had full notice of, and the opportunity to investigate, the constructive discharge claim. The constructive discharge is like or reasonably

related to the retaliation alleged in the administrative complaint and grew directly from that retaliation, and it is properly before this Court.

28. More than 180 days have passed since the filing of Dr. Charlton's administrative complaint on December 12, 2025, and the Secretary of Labor has not issued a final decision.

29. The delay is not due to any bad faith on the part of Dr. Charlton. Under 18 U.S.C. § 1514A(b)(1)(B), a SOX complainant may bring an action for de novo review in the appropriate federal district court if the Secretary has not issued a final decision within 180 days of the filing of the administrative complaint. Dr. Charlton has satisfied that condition and is entitled to proceed in this Court.

30. Dr. Charlton has provided the required notice of his intent to file this action. On or about September 1, 2026, in accordance with 29 C.F.R. § 1980.114(a), Dr. Charlton served written notice on OSHA of his intent to file a complaint in federal district court, and this Complaint is being served on the Assistant Secretary of Labor, the Solicitor of Labor, and OSHA in accordance with 29 C.F.R. § 1980.114(b). Dr. Charlton's filing of this Complaint constitutes an election to proceed in federal district court and terminates the administrative proceedings, consistent with 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. § 1980.114(c).

31. Dr. Charlton is therefore authorized to bring this action in federal district court under 18 U.S.C. § 1514A(b)(1)(B).

32. The administrative complaint and this action are based on the same facts.

33. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dr. Charlton's claims occurred in this District, and under 18 U.S.C. § 1514A(b)(2)(A) because Dr. Charlton resided in this District on the dates of the violations alleged herein.

34. Dr. Charlton resided in Chicago, Illinois throughout his employment with Madrigal. He performed his work for Madrigal, including substantial portions of the protected activity alleged below, from his home office and residence in this District.

35. He developed and ran his analysis of the FDA Adverse Event Reporting System from this District.

36. He was on medical leave recovering from emergency surgery at his residence in this District when Madrigal announced his replacement.

37. And he resigned, and suffered the constructive discharge alleged herein, while residing in this District.

38. The reputational and professional harm Madrigal inflicted on Dr. Charlton was suffered, and continues to be suffered, in this District, where Dr. Charlton lives and where his professional career is based.

## FACTUAL ALLEGATIONS

### A. Madrigal Recruits Dr. Charlton Away From an Elite Academic Career.

39. Dr. Charlton is one of the most accomplished hepatologists in the world.

40. His career in translational medicine, the work of turning laboratory science into treatments that reach actual patients, spans more than three decades, including work as an investigator and advisor in clinical development across a wide range of therapeutic agents, from preclinical research through FDA approval.

41. Dr. Charlton's credentials are exceptional by any measure. He has been inducted as a Fellow of the Royal College of Physicians, a recognition awarded to a small fraction of physicians.

42. He was elected to and served as President of the International Liver Transplant Society, one of the leading professional societies for specialists in liver disease.

43. He has served as principal investigator on National Institutes of Health grants studying the pathophysiology of liver disease, the biological processes by which the disease takes hold and damages the body, and as a lead investigator for national and international clinical trials in MASH, immunosuppression, and viral hepatitis.

44. He is an author of four issued patents. He has been invited to write professional-society practice guidelines for the management of liver disease.

45. When Madrigal recruited him, Dr. Charlton held a highly compensated, open-ended academic position as Medical Director of the Transplant Institute and Director of the Regenerative Medicine Program at the University of Chicago, where he was a Professor of Medicine.

46. He had previously served as Director of Hepatology and Medical Director of Liver Transplantation, Professor of Medicine, and Chair of the Institutional Review Board at the Mayo Clinic, the most renowned health care organization and liver disease program globally.

47. To join Madrigal, Dr. Charlton gave up his university appointments, his role as principal investigator on NIH grants, role as an investigator and scientific advisor to a host of pharmaceutical companies and his directorship of a long-running cross-functional scientific conference.

48. He stepped away from a secure and distinguished career in academic medicine.

49. His recruitment brought substantial scientific credibility to Madrigal.

50. In August 2024, Madrigal extended Dr. Charlton an offer of employment as Senior Vice President, Head of Clinical Development. Dr. Charlton's first day as a Madrigal employee was October 1, 2024.

51. Dr. Charlton was hired for a specific purpose. As Senior Vice President, Head of Clinical Development, he was responsible for overseeing the safety, the scientific integrity, and the conduct of clinical trials for Madrigal's novel therapeutics, including its flagship MASH therapy, resmetirom, marketed as Rezdiffra.

52. Madrigal reports the results of those clinical trials in its public statements, in its submissions to the U.S. Food and Drug Administration ("FDA"), and in its filings with the U.S. Securities and Exchange Commission ("SEC").

53. Dr. Charlton's role placed the accuracy and integrity of those disclosures squarely within his responsibilities.

54. On Dr. Charlton's first day at Madrigal, Dr. Rebecca Taub, founder of Madrigal and then the Chief Medical Officer, circulated an introductory email to the Clinical Development team, including Dr. Richard Pushkin, Dr. Erik Ness, Dr. David Schneider, and Dr. Geoffrey Rezvani, informing them that Dr. Charlton was the head of Clinical Development and that they would report to him.

55. Dr. Charlton chaired the Protocol Review Committee, the institutional oversight committee that evaluates clinical-trial protocols for scientific merit, feasibility, and safety.

56. Madrigal's contemporaneous press release of October 1, 2024 announced Dr. Charlton's appointment and quoted Chief Executive Officer Bill Sibold ("CEO Sibold") describing Madrigal's clinical-development program as its "most advanced and comprehensive."

**B. Dr. Charlton Reports Serious Safety Concerns to Madrigal's Senior Executive Leadership.**

57. Shortly after joining Madrigal in October 2024, Dr. Charlton was asked to evaluate several cases of patients who had experienced hepatic decompensation, including a case requiring urgent liver transplantation, after beginning commercial resmetirom treatment.

58. Hepatic decompensation is a serious and sometimes life-threatening turn in liver disease, the point at which a damaged liver can no longer keep up with its essential work, producing complications such as a yellowing of the skin and eyes,

a buildup of fluid in the abdomen, internal bleeding, and the accumulation of toxins that clouds brain function.

59. Dr. Charlton was alarmed by what he found, and by the way Madrigal was responding to it.

60. Dr. Charlton was particularly alarmed by the role of Dr. Taub. Dr. Taub is a founder of Madrigal, a member of its Board of Directors, a major shareholder of Madrigal equity, and the former Chief Medical Officer.

61. Despite a profound conflict of interest, Dr. Taub played a prominent role in assessing the perceived safety and efficacy of resmetirom.

62. Dr. Charlton observed conduct including the editing of clinical-center narratives authored by treating providers and clinical teams, so as to alter the recorded cause of hepatic decompensation away from possible drug-induced liver injury, that is, liver damage caused by the drug itself rather than by the patient's underlying disease. He noted the sudden departure of Madrigal's Vice President for Pharmacovigilance, who had been responsible for overseeing safety of Rezdiffra, within a few months of her starting at Madrigal.

63. On multiple occasions, including on October 22, 2024, November 28, 2024, December 9, 2024, and January 17, 2025, Dr. Charlton reported directly to Madrigal's senior executive leadership serious concerns about the assessment of potential cases of hepatotoxicity, or liver damage caused by a drug, that had emerged during the conduct of Madrigal's clinical studies 11, 14, 18, and 19. His reports included several concerns.

64. First, Dr. Charlton reported delayed discontinuation of study drug. In some instances, patients who had experienced hepatic decompensation remained on study drug for more than twelve months, even though the governing study protocols required discontinuation of study drug upon documented hepatic decompensation. Hepatic decompensation is itself known to substantially increase the liver's exposure to resmetirom, by up to 20-fold, well beyond the established safe limits of drug exposure, because a failing liver clears the drug from the body more slowly.

65. Second, Dr. Charlton reported the failure to acknowledge or report potential hepatotoxicity and hepatic decompensation cases.

66. At least two cases of hepatic decompensation in studies 11 and 19 remained unrecognized and unreported for adjudication, the formal review process by which a panel decides whether a patient's adverse medical event was caused by the study drug. All cases of potential resmetirom-associated hepatotoxicity and other liver-related adverse events (e.g. liver failures and liver cancer) were pre-screened and the narratives of cases were edited by Dr. Taub before being sent to committees of independent experts for assessment of the nature and cause of the events. This included cases for which Dr. Taub had been unblinded to treatment assignment. Actions by Dr. Taub included requesting removal of a patient who had developed a life-threatening complication of their liver disease from an ongoing Phase 3 clinical trial after requesting information that could reveal to her which treatment group (resmetirom vs. placebo) the patient had been assigned.

67. A participant in study 18 remained on resmetirom despite developing jaundice, a yellowing of the skin and eyes that appears when the liver can no longer clear waste from the blood.

68. The jaundice resolved when resmetirom was interrupted and recurred when resmetirom was reintroduced, a pattern strongly suggesting that the drug itself was injuring the liver.

69. Third, Dr. Charlton reported the intimidation of study personnel by Dr. Taub, including shouting at and insulting members of Madrigal's clinical research organization, the pharmacovigilance team responsible for monitoring the drug's safety once patients are taking it, and the clinical development team. That conduct contributed to the departure of two members of the clinical development team.

70. Fourth, in December 2024, Madrigal leadership learned from a real-world claims database study conducted by Madrigal's own Health Economics and Outcomes Research group that approximately seven percent of patients receiving commercial Rezdiffra had a diagnostic code for decompensated cirrhosis, the advanced stage of permanent liver scarring at which the liver has begun to fail, a population for which the drug carried safety concerns and to which prescribing was contrary to the FDA label.

71. Those data were deliberately withheld and suppressed, foregoing the opportunity to raise awareness and to implement simple measures to avoid

prescribing to patients with decompensated cirrhosis, measures the clinical development team had proposed.

72. Dr. Charlton reported these concerns to senior executive leadership, including directly to CEO Sibold. CEO Sibold assured Dr. Charlton that things would change. They did not.

73. In January 2025, Madrigal's senior executive leadership became aware that a healthcare research firm had published several reports of drug-induced liver injury among patients taking resmetirom, drawn from cases reported through the FDA Adverse Event Reporting System ("FAERS").

74. Those cases were known to Dr. Taub, who had assessed them as unrelated to resmetirom.

75. Executive leadership asked to be promptly informed of future potential drug-induced liver injury cases, regardless of attribution.

76. Acting on that direction, Dr. Charlton set up a program to interrogate the FAERS quarterly reports for evidence of hepatotoxicity.

77. The results revealed a strong signal. Measured by relative reporting frequency, a comparison of how often a particular side effect is reported for one drug versus others, resmetirom outranked every other agent queried, including drugs already known to injure the liver, across the standardized side-effect terms that point to liver toxicity.

78. On February 15, 2025, Dr. Charlton presented this analysis, generated from publicly accessible FDA data, together with his concerns about safety and

about Dr. Taub's participation in the adjudication process, to executive leadership including CEO Sibold, to Senior Vice President Thomas Hare, to Madrigal's Pharmacovigilance leadership, and to Clinical Development Vice Presidents Erik Ness and David Schneider.[1]

79. Madrigal's senior executive leadership did not respond with concern for patient safety. It responded with concern that Dr. Charlton had run the analysis at all. A Senior Vice President of Clinical Operations was openly upset that the analysis had been conducted, stating that Dr. Charlton's analysis *"put the company at risk."* No member of executive leadership expressed concern for patient safety. Dr. Charlton was ridiculed for raising the issue.

### C. Dr. Charlton Reports Serious Concerns Regarding Scientific Integrity and the Accuracy of Madrigal's Public, Regulatory, and Investor Disclosures.

80. During his employment, Dr. Charlton also reported serious concerns to Madrigal's senior executive leadership about the scientific integrity of Madrigal's data and the accuracy of the results Madrigal was presenting publicly, to the FDA, to foreign regulators, and to investors.

[1] Subsequent independent research supports those concerns. A 2026 analysis compared reports in FAERS with the FDA's 2024 prescribing information for Rezdiffra (the "2024 Label"). See Liu et al., Front. Pharmacol. 2026;17:1895524 (including Supplementary Table S6). The 2024 Label describes only one clinical-trial patient with total bilirubin at 15 times the upper limit of normal ("ULN"), together with alanine aminotransferase at 58 times ULN and aspartate aminotransferase at 66 times ULN, and it lists jaundice only as a sign to monitor in Section 5.1 (Warnings and Precautions). Its clinical-trial data show no excess of elevated bilirubin: total bilirubin above 2× ULN occurred in 1–3% of patients on Rezdiffra and 2% of patients on placebo. As of the filing of this Complaint, FAERS contains at least 30 unique reports by health care providers that include a visible-jaundice term, and at least 55 that include any bilirubin or jaundice term, along with 14 reports of hepatic failure, eight of drug-induced liver injury, and four of autoimmune hepatitis. Those reports present a picture of Rezdiffra's hepatic safety materially broader than the 2024 Label describes, and they bear out the concerns Dr. Charlton presented on February 15, 2025.

81. The most prominent example concerned a late-breaker presentation on the two-year effects of resmetirom on parameters of liver function and stiffness in study 18, prepared for the annual meeting of the European Association for the Study of the Liver ("EASL"), the most important scientific venue in the field.

82. David Soergel, the Chief Medical Officer who had succeeded Dr. Taub ("CMO Soergel"), requested that the presentation undergo a quality-control review to corroborate the findings.

83. That quality-control review revealed pervasive problems. To Dr. Charlton's knowledge, no scientific presentation or publication had been subjected to a formal quality-control process during his time at Madrigal before this one. Almost no data point or result in the presentation could be replicated from the underlying source data.

84. Many discrepancies were the product of what one team member described as the selective use and manipulation of data by Dr. Taub. Some results could not be accounted for at all.

85. The results that could not be replicated from source data included the primary findings regarding improvements in liver stiffness, measured by vibration-controlled transient elastography, the non-invasive ultrasound-based reference Madrigal uses to demonstrate that resmetirom reverses liver fibrosis, the scarring of the liver that MASH produces.

86. The review of these discrepancies was performed by a team that included members of executive leadership, including CMO Soergel and CEO Sibold.

87. Changes were made to the presentation after repeated discussions with Dr. Taub and the quality-control team. In every instance, the discrepancies had enhanced the apparent therapeutic efficacy or safety of resmetirom.

88. On May 11, 2025, Dr. Charlton again explained to CEO Sibold that, on quality-control review, the central findings regarding changes in liver stiffness could not be reproduced from the source data. Madrigal's Chief Investor Relations Officer, Tina Ventura, and its Chief Financial Officer, Mardi Dier, were present.

89. CEO Sibold directed Dr. Charlton to ignore the discrepancies. He stated, forcefully: *"Stop looking. You. Julie. Xiaomin. Stop."*

90. CEO Sibold's "stop looking" directive was the same response Madrigal had given to the safety concerns Dr. Charlton had raised. It was a directive to stop investigating and, by implication, to acquiesce in conduct Dr. Charlton reasonably believed violated the law.

91. The presence of Madrigal's Chief Investor Relations Officer and Chief Financial Officer, the two executives most responsible for what Madrigal communicates to investors, underscored what the directive was about. Dr. Charlton did not comply.

92. Despite Dr. Charlton's documented objections, Madrigal presented the disputed efficacy data at EASL and recapitulated it to investors. Madrigal then presented essentially the same data at multiple subsequent meetings.

93. Dr. Charlton was closely involved in those investor presentations as his role required. The data he had reported internally as unverifiable were the same data Madrigal placed before its shareholders.

94. When Dr. Charlton later learned that CMO Soergel had purportedly implemented a "new quality-control process," he discovered that the "new" process was to have the data reviewed solely by the same individuals who had generated the inaccurate presentation in the first place.

95. In substance, no quality control would occur.

96. Dr. Charlton also reported that Madrigal's representations to investors about the progress of studies 11 and 19, the studies from which suitability for full FDA approval would be determined, were similarly inaccurate.

97. Detailed internal estimates, based on actual observed clinical outcome event rates, showed that study 19 was unlikely to be completed by the end of 2027, the completion date Madrigal had represented to many investors.

98. Dr. Charlton reported that conclusion to CEO Sibold on January 17, 2025. Madrigal nonetheless continued to reassure investors about the 2027 completion date.

99. On February 6, 2025, less than three weeks after Dr. Charlton's report to CEO Sibold, Madrigal reassured representatives of Janus, one of its institutional investors, that study 19 would be completed on time, despite Madrigal's own internal estimates showing the opposite.

100. By August 2025, Madrigal's internal analysis showed that the most likely completion date for study 19 was April 2029 or later. Madrigal did not report that revised timeline to its investors.

101. Dr. Charlton further reported that Dr. Taub, an unblinded Board member and major shareholder, had played a central and improper role in the conduct and adjudication of studies 11 and 19.

102. Maintaining the blind is a foundational principle of clinical-trial integrity. Individuals responsible for trial conduct, monitoring, data management, and endpoint adjudication must remain blinded to treatment assignments.

103. Dr. Charlton reported that Dr. Taub had been unblinded for study 11, the study used for the accelerated FDA approval of resmetirom, and had nonetheless participated in its day-to-day conduct, including changing event definitions, overseeing narrative development for potential hepatic decompensation cases, deciding which cases would be forwarded to formal adjudication, recommending revisions to study protocols and the statistical analysis plan, and reviewing and approving multiple protocol versions after the date of unblinding.

104. Dr. Charlton also reported material inaccuracies in Madrigal's regulatory submissions to foreign regulators.

105. In preparing submissions to the Pharmaceuticals and Medical Devices Agency ("PMDA"), the Japanese counterpart to the FDA, Dr. Charlton's team reviewed the Clinical Study Report for MAESTRO-NASH and found that the

report's figures and legends describing how resmetirom is processed by the body, and what effects it produces, were wholly inaccurate.

106. The Clinical Study Report, for example, stated that there was no variation in how resmetirom was absorbed and processed across ethnic groups, when the underlying data showed statistically significant variation.

107. On reviewing the discrepancy, Madrigal's own pharmacokinetics expert, the specialist who studies how the body absorbs, distributes, and eliminates a drug, said: *"It is as if we wrote the conclusions without regard for the data."*

108. Each of the reports described above was protected activity.

109. Dr. Charlton reported information that he reasonably believed showed that Madrigal was engaged in conduct constituting mail fraud, wire fraud, securities fraud, violations of SEC rules and regulations, and fraud against shareholders.

110. He reported that Madrigal's irregularities rendered its public statements, its FDA submissions, its submissions to foreign regulators, and its disclosures to investors materially misleading.

111. A reasonable person in Dr. Charlton's position, with his training and his vantage point inside Madrigal's clinical development function, would have held the same belief.

### D. Madrigal Retaliates: It Strips Dr. Charlton of His Title, Authority, and Duties.

112. Madrigal's retaliation followed Dr. Charlton's protected activity closely and unmistakably.

113. On June 19, 2025, roughly five weeks after Dr. Charlton told CEO Sibold on May 11, 2025 that the EASL efficacy results could not be confirmed by the source data and was told to "*stop looking*," CMO Soergel and CEO Sibold informed Dr. Charlton that he would be moved to a new position.

114. The move was initially presented as a promotion, framed as a chief-officer-level role. It was not.

115. As discussions progressed, it became apparent that the role had no clear remit and would not involve clinical development, safety, primary data analysis, or scientific integrity, the substance of Dr. Charlton's expertise.

116. Dr. Charlton later learned the change was not to a chief-officer position at all, but a lateral move to another Senior Vice President position with no significant leadership.

117. Madrigal did not wait for the formal reassignment to take effect before sidelining Dr. Charlton.

118. Specifically, Madrigal removed him from key meetings; excluded him from project decision-making; excluded him and his team from the analysis and review of publications relating to clinical activities; stripped him of his direct reports and his managerial authority; and cut him out of the substantive responsibilities that had defined his role and that were the reason Madrigal had recruited him.

119. On October 29, 2025, while Dr. Charlton was on medical leave, CMO Soergel informed him that he would be formally replaced as Senior Vice President, Head of Clinical Development.

120. On November 12, 2025, Madrigal internally announced a newly appointed Senior Vice President, Clinical Development.

121. Dr. Charlton's direct reports were transferred to that new person.

122. Madrigal replaced Dr. Charlton, a globally recognized hepatologist recruited specifically for his expertise in liver disease, with a colleague who has no experience in MASH or any other liver disease, the therapeutic area on which Madrigal's only approved drug, and essentially all of its revenue, depend.

123. At or about the same time as the replacement announcement, Madrigal removed Dr. Charlton from his chairmanship of the Protocol Review Committee and from his membership on that committee, eliminating his institutional role in reviewing the company's clinical-trial protocols.

124. On December 16, 2025, Madrigal revealed the details of Dr. Charlton's new title and responsibilities. What remained was a nominal role, stripped of leadership, stripped of supervisory authority, and stripped of any substantive function in Dr. Charlton's domain of expertise.

125. Each of these actions, the removal of the "Head of" designation and the loss of title, the removal of supervisory authority and direct reports, the removal of the Protocol Review Committee chairmanship, the removal of core clinical and scientific duties, the exclusion from meetings and from publication review, and the

replacement by a demonstrably less-qualified individual, was a materially adverse employment action.

126. Each action above was reasonably likely to deter a reasonable employee from engaging in protected activity.

127. Together, they constituted a demotion in fact, regardless of whether Madrigal reduced Dr. Charlton's base salary.

**E. Madrigal Forces Dr. Charlton to Resign.**

128. On or about December 12, 2025, Dr. Charlton filed his complaint with OSHA.

129. Before his resignation, Dr. Charlton was scheduled to speak at a major upcoming international scientific conference, attended by leaders from academia, the pharmaceutical industry, the investor community, and the National Institutes of Health. Dr. Charlton had been scheduled to speak at that conference in the ordinary course of his role at Madrigal, well before Madrigal announced his replacement and revealed his new title.

130. Any presentation Dr. Charlton delivered to an external audience while employed by Madrigal was subject to Madrigal's contractually required internal review and approval process. Speaking at the conference as a Madrigal employee therefore meant delivering a presentation Madrigal reviewed, cleared, and approved. Madrigal's clearance would necessarily require Dr. Charlton to endorse Madrigal's efficacy data, the very data Dr. Charlton had repeatedly reported internally, and had reported to OSHA, as unverifiable and potentially fraudulent.

131. Publicly promoting a company's data is a routine and expected part of the role of a Senior Vice President of Clinical Development at a public biopharmaceutical company. It is one of the ways executive scientific leadership is expected to represent the company to its scientific, medical, regulatory, and investor audiences. Dr. Charlton's scheduled conference appearance was within that expectation.

132. The conference appearance therefore left Dr. Charlton with no acceptable option. He could appear as a Madrigal employee and, through Madrigal's internal review and approval process, lend his globally recognized medical and scientific credentials to data he reasonably believed was materially false, exposing himself to liability, professional discipline, and deeper entanglement in the conduct he had reported.

133. He could attempt to refuse to present the cleared content and face the certainty of escalating retaliation for failing to perform an expected function of his role. Or he could resign in advance of the conference and speak only in his personal capacity.

134. Madrigal wanted Dr. Charlton to represent it publicly precisely because of the scientific credibility his name carried. Using that credibility to validate suspected fraud would have caused Dr. Charlton irreparable professional and reputational harm.

135. The combination of these circumstances made Dr. Charlton's continued employment objectively intolerable.

136. Madrigal had reduced him to a hollow role with no meaningful function in his field, signaling to him and to the professional community that his career within Madrigal was over.

137. An already-scheduled public speaking obligation was about to require him, through Madrigal's contractual clearance process, to publicly endorse data he had reported as fraudulent.

138. A reasonable person in Dr. Charlton's position, a physician-scientist whose professional reputation is the product of more than three decades of rigorous work, would have felt compelled to resign in advance of that appearance.

139. On January 5, 2026, Dr. Charlton resigned. His resignation was a constructive discharge. It was the direct and foreseeable result of Madrigal’s retaliatory conduct, and it is itself a cognizable adverse action.

**F. Madrigal’s Retaliation Has Caused Dr. Charlton Substantial and Continuing Harm.**

140. Madrigal’s retaliation has caused, and continues to cause, substantial damage to Dr. Charlton’s professional reputation, his career, and his economic future.

141. Dr. Charlton left an elite and secure academic career to join Madrigal in reliance on the representation that Madrigal was a legitimate enterprise.

142. Instead, his association with Madrigal’s conduct, and his abrupt removal after barely a year, has stigmatized him in the medical, regulatory, and biopharmaceutical communities.

143. Future employers will draw negative inferences from the fact that a physician of Dr. Charlton's extraordinary credentials was removed from a senior role after barely a year, because they will not know the unlawful reasons his employment ended.

144. The substitute opportunities realistically available to Dr. Charlton are markedly inferior to the position Madrigal recruited him into and to the academic career he gave up, and they pay substantially less.

145. Dr. Charlton has suffered, and will continue to suffer, lost wages and lost earning capacity, the loss of the value of his equity and benefits, reputational harm, and severe emotional distress.

**COUNT I**
**Retaliation in Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A**

146. Dr. Charlton incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

147. Madrigal is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, and is therefore subject to the whistleblower-protection provisions of 18 U.S.C. § 1514A.

148. Section 1514A prohibits a covered employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information regarding conduct the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities fraud, a violation of any SEC rule or regulation, or a violation of

any federal law relating to fraud against shareholders, when the information is provided to a person with supervisory authority over the employee or to other persons working for the employer who have authority to investigate, discover, or terminate misconduct.

149. Dr. Charlton engaged in protected activity as alleged herein.

150. Dr. Charlton repeatedly provided information to Madrigal's senior executive leadership, including directly to his supervisor, CEO Sibold, regarding conduct he reasonably believed constituted mail fraud, wire fraud, securities fraud, violations of SEC rules and regulations, and fraud against shareholders.

151. Dr. Charlton's reports concerned the suppression of adverse safety data, the manipulation and selective use of clinical data, the public and regulatory presentation of efficacy results that could not be reconciled with source data, the inaccuracy of Madrigal's representations to investors about clinical-trial timelines, the inaccuracy of Madrigal's submissions to foreign regulators, and the improper participation of an unblinded Board member in the conduct and adjudication of pivotal clinical trials.

152. Dr. Charlton reasonably believed this conduct rendered Madrigal's public statements, FDA submissions, foreign-regulator submissions, and disclosures to investors materially misleading.

153. Dr. Charlton's belief was objectively reasonable. He held the training, expertise, and vantage point of the Senior Vice President responsible for the safety and integrity of the very clinical trials at issue.

154. Because Rezdiffra accounted for essentially all of Madrigal's revenue and underpinned its market valuation, a reasonable person in Dr. Charlton's position would understand that adverse safety findings, unreproducible efficacy data, and inaccurate clinical-trial timelines involving Rezdiffra were material to Madrigal's investors.

155. Dr. Charlton need not prove that Madrigal's statements were in fact false or material to establish protected activity; it is enough that a reasonable person in his position could believe the conduct constituted a violation of the enumerated laws.

156. Madrigal knew Dr. Charlton had engaged in protected activity. He reported his concerns directly to Madrigal's most senior executives, including CEO Sibold and CMO Soergel, who received his reports and responded to them, including by directing him to "stop looking" in the presence of Madrigal's Chief Investor Relations Officer and Chief Financial Officer.

157. Dr. Charlton suffered unfavorable personnel actions.

158. Madrigal stripped him of his title and his "Head of" leadership designation, removed his supervisory authority and his direct reports, removed his chairmanship and membership of the Protocol Review Committee, removed his core clinical and scientific duties, excluded him from meetings and from clinical-publication review, replaced him with a demonstrably less-qualified individual, and ultimately forced his resignation.

159. Each of these actions, and their cumulative effect, constituted an unfavorable personnel action within the meaning of Section 1514A. Dr. Charlton's resignation on January 5, 2026 was a constructive discharge and an independent unfavorable personnel action.

160. Dr. Charlton's protected activity was a contributing factor in the unfavorable personnel actions. The temporal proximity between his protected activity and Madrigal's retaliation is striking: Madrigal told Dr. Charlton he would be removed from his role roughly five weeks after he reported to CEO Sibold that the EASL efficacy data could not be confirmed and was told to "stop looking." The "stop looking" directive itself is direct evidence of retaliatory animus.

161. The escalating sequence of adverse actions tracked Dr. Charlton's escalating reports. And Madrigal's decision to replace the head of clinical development for a liver-disease company with a person who has no liver-disease experience defies any legitimate business justification, and is itself evidence that the motivation was retaliatory.

162. Madrigal cannot demonstrate, by clear and convincing evidence, that it would have taken the same unfavorable personnel actions against Dr. Charlton in the absence of his protected activity.

163. Madrigal recruited Dr. Charlton precisely because of his expertise and credibility, gave up nothing in the way of contemporaneous documented performance concerns, and replaced him with a less-qualified individual.

164. There is no legitimate, non-retaliatory explanation for Madrigal's conduct.

165. As a direct and proximate result of Madrigal's violation of Section 1514A, Dr. Charlton has suffered damages, including lost back pay, lost future earnings, the loss of the value of his equity and benefits, reputational harm, and emotional distress.

166. Under 18 U.S.C. § 1514A(c), Dr. Charlton is entitled to all relief necessary to make him whole, including reinstatement with the same seniority status he would have had but for the retaliation, back pay with interest, and compensation for special damages, including litigation costs, expert witness fees, and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michael Charlton, M.D., respectfully requests that this Court enter judgment in his favor and against Defendant Madrigal Pharmaceuticals, Inc., and grant the following relief:

A. Ordering Dr. Charlton's reinstatement to the position, seniority, and status he would have held but for Madrigal's retaliation, or, in lieu of reinstatement, awarding front pay in an amount to be determined at trial;

B. Awarding back pay with interest, in an amount to be determined at trial;

C. Awarding compensatory damages, including damages for the loss of the value of Dr. Charlton's equity and benefits, for reputational harm, and for emotional distress, in an amount to be determined at trial;

D. Awarding all other special damages sustained as a result of Madrigal's retaliation;

E. Awarding any penalty available under the Illinois Whistleblower Act;

F. Awarding Dr. Charlton his litigation costs, expert witness fees, and reasonable attorneys' fees, as provided by 18 U.S.C. § 1514A(c);

G. Awarding pre-judgment and post-judgment interest as allowed by law; and

H. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff Michael Charlton, M.D., demands a trial by jury on all claims and issues so triable.

Dated: October 9, 2026

Respectfully submitted,

MICHAEL CHARLTON, M.D.

By: /s/ Jeffrey R. Kulwin

One of His Attorneys

Jeffrey R. Kulwin
KULWIN, MASCIOPINTO &
KULWIN, LLP
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
Tel: (312) 641-0300
E-mail: jkulwin@kmklawllp.com
Counsel for Plaintiff